A04A0794. DIXON v. THE STATE.
(601 SE2d 748)

PHIPPS, Judge.

Terrence Dixon was convicted of aggravated assault and sentenced to serve 20 years in confinement. He claims that he did not receive a fair trial because the state introduced evidence of his aborted first trial and of his guilty plea, which was subsequently withdrawn. He also claims that his trial counsel was ineffective in numerous respects. Finding no reversible error, we affirm.

Viewed in the light most favorable to the prosecution, the evidence showed that on July 4, 1997, at about midnight, Leisha Bearden returned to her apartment complex after visiting with family out of town. During her absence, the apartment management had changed the locks on all of the doors, but had not provided the residents with new keys. As a result, Bearden had to page the security guard to let her into her apartment. The only pay phone at the complex was located outside the swimming pool. When Bearden went toward the phone, she saw someone swimming in the pool. She made the call and sat down in a weight room located in the clubhouse next to the pool to wait for the security guard to call her back.

While Bearden was waiting, a naked, wet, African American man walked into the doorway of the weight room. She said that she got a good look at his face as he stood there. When the man walked past the weight room and into the laundry room, Bearden got up and tried to run out of the door. At that point, the man asked her where she

thought she was going, ran after her and pushed her out of the door. He then started beating her in the head as she was lying on the ground. Bearden screamed for him to stop and when he finally did stop, she ran to a friend's apartment near the pool.

Janice Stancil lived in a nearby apartment. On the night of July 4, 1997, she was awakened by a loud, continuous scream. Stancil looked out her window and saw Bearden running from the clubhouse to one of the apartment buildings. Stancil also saw four men who lived in the apartment below her come out of their apartment and head toward the pool. As she looked toward the pool, Stancil saw an African American man at the corner of the pool trying to put his clothes on. She then saw him stand on a lounge chair and duck down as the four men from the apartment got closer to him. Stancil said that police officers arrived at that point, and the man by the pool climbed over the fence surrounding the pool. Stancil's roommate was getting into bed at the time and also heard the screaming. She testified that she often heard noises outside her apartment, but that this screaming scared her.

Adrian Rucker, who lived in the same apartment building as Stancil, was in his room on July 4 when he heard screaming that caused him to be alarmed. As he looked out his window, Rucker saw a woman being struck by an African American man. Rucker then ran out of his apartment to see what was happening. The three other men in his apartment followed him. Rucker headed toward the clubhouse and, as he looked through the fence surrounding the pool, he saw a naked African American man sitting on a lounge chair, trying to get dressed. Shortly thereafter, Rucker saw a naked man on the other side of the fence.[1] Rucker identified that man as Dixon. Rucker asked him what he was doing and Dixon responded, "I was about to be fucking." The police arrived shortly thereafter.

Officer Michael Wagner was one of the officers who responded to the scene. When he arrived, he saw several African American men standing at the back of the pool and one of them was only partially clothed. He then went to see about Bearden and observed blood in her hair and dripping from her face. When the paramedics arrived, Bearden was placed on a stretcher. Wagner asked her if she could identify the person who attacked her and she said that she could. Wagner had Dixon, Rucker and the other three men from Rucker's apartment participate in a lineup at the scene. All of the men were African American, and all of them were clothed at the time of the lineup. Bearden identified Dixon.

---

[1] Rucker did not see Dixon climb over the fence.

The officers at the scene recovered Dixon's wet boxer shorts near the pool. Officer Victor Reyes found a knife under a leaf in the pool area, approximately three feet from where Dixon was sitting. There was blood on the knife, but it could not be identified.

Dixon testified at trial and admitted that he went swimming at the apartment complex at about 11:30 p.m. on July 4 and that while swimming, he was wearing the boxer shorts that the officers recovered during their investigation. He testified that he got out of the pool some time after midnight, when he saw a police car circle the pool area. He then got dressed, except for his shirt and his boxer shorts, and climbed over the fence. On the other side of the fence, he saw Rucker and the three men from Rucker's apartment. Dixon testified that he never saw Bearden and never heard her scream, but denied that he was under the water for a long period of time. He said that there was no one else in the pool area with him until the police officers arrived.

On August 10, 1998, a jury was selected to hear the state's case against Dixon. On August 11, before any evidence was presented, Dixon fled from the courthouse. After Dixon was located several hours later, he pled guilty. On September 1, 1998, Dixon filed a motion to vacate his guilty plea. The trial court granted Dixon's motion, with no objection from the state.

Prior to the second trial, Dixon filed a motion for change of venue based on pretrial publicity about the facts of the case and his guilty plea. Although it does not appear from the record that the trial court ever ruled on this motion, venue was not changed.

1. Dixon claims that he did not receive a fair trial because the state introduced evidence of his flight from his first trial and of his guilty plea.

At trial, Bearden testified that she was afraid for her safety on the day of the first trial because Dixon had run away from the courtroom. Wagner testified that Dixon disappeared from the courtroom on August 11 and that he returned five or six hours later, with the help of law enforcement officers. Wagner also testified about Dixon's guilty plea. Dixon did not object to any of the testimony about which he now complains.

During voir dire, Dixon's attorney asked the jury pool if they remembered reading anything about this case. A few of the potential jurors told her that they did remember reading about it in the newspapers. Dixon's attorney then said

> there was an article back in 1997 when [Dixon] was first arrested and accused of this crime and his picture was on the front page and then back in 1998 — I disclose this to you all because I want to be able to know what people know — on

August the 10th, and this made the front page of the newspaper. I believe that's the article that you may remember. My client came to court for his first trial at the time and then my client left the courtroom. . . . [O]n August the 11th, I believe is when he left the courtroom. Let me make sure I'm correct. He came back. He was then represented by another lawyer, not myself. And this will come up later also. I wanted to disclose everything to you. My client at that time pled guilty. My client then, on his own — and the newspaper describes the guilty plea as my client crying in the courtroom. . . . At that — my client, then on his own and he's only 19 years old now, wrote a motion to the Judge requesting that his guilty plea be withdrawn and that he be allowed to withdraw that plea because it was involuntarily given and to have this new trial today. . . . I wanted to disclose that because your community is not that large and there is a newspaper out there. Has anything that you've ever read about the case had any effect about your ability to be a fair and impartial judge for my client here today and for the State?

During opening argument, Dixon's attorney again mentioned Dixon's guilty plea and the fact that it was withdrawn because it was involuntary.

(a) Dixon's claim that the state improperly introduced evidence that he fled from his first trial is without merit.

"Flight is always a circumstance which may be shown and a jury is authorized to take into account in determining guilt or innocence of an accused."[2] The flight does not have to take place immediately, but can occur at any time before or even during the trial.[3] The state did not improperly introduce evidence that Dixon left the courtroom during his first trial.[4]

(b) Dixon claims that the testimony regarding his guilty plea was in violation of OCGA § 17-7-93 (b), which provides in part that "[a]t any time before judgment is pronounced, the accused person may withdraw the plea of 'guilty' and plead 'not guilty'; and the former plea shall not be admissible as evidence against him at his trial."

Wagner's testimony regarding Dixon's guilty plea was inadmissible. Although Dixon's attorney failed to object to the improper

---

[2] *Johnson v. State*, 148 Ga. App. 702 (1) (252 SE2d 205) (1979).

[3] See id. at 702-703; see also *Carruth v. State*, 155 Ga. App. 666 (1) (272 SE2d 531) (1980) (flight took place after first day of trial).

[4] See *Johnson*, supra.

testimony, we do not find that that failure resulted in a waiver.[5] However, after reviewing all of the evidence in this case, we conclude that the error in admitting evidence of Dixon's plea was harmless in light of the overwhelming evidence of Dixon's guilt.[6]

2. Dixon claims that his trial counsel was ineffective because she discussed his first trial and subsequent guilty plea during voir dire and opening statement, introduced evidence of his prior criminal history, failed to move for a change of venue and failed to object to leading questions by the state.

> A defendant claiming ineffective assistance of counsel must show (1) that his attorney's representation in specified instances fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. In addition, there is a strong presumption that trial counsel's performance falls within the wide range of reasonable professional assistance and that any challenged action might be considered sound trial strategy.[7]

Dixon points out several errors by his trial counsel. We must consider each claim of inadequacy independently of other claims, as Georgia does not recognize the cumulative error rule.[8]

(a) Dixon claims that his trial counsel was ineffective because she discussed his flight during his first trial and his subsequent guilty plea during voir dire and opening statement.

At the motion for new trial hearing, trial counsel testified that she mentioned Dixon's guilty plea in voir dire because she was aware that some members of the jury knew about it and she wanted to "deal[] with it head on instead of looking [like] I was trying to hide something." Although trial counsel testified that this was a strategic decision, we cannot conceive of a sound trial strategy that would involve telling the jury that the defendant had initially pled guilty to the offense for which he was being tried.[9] Such information is clearly harmful to the defendant.[10] For that reason, the General Assembly

---

[5] See *Shoemake v. State*, 213 Ga. App. 528, 529-530 (445 SE2d 558) (1994).

[6] See *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869) (1976); see also *Shoemake*, supra (application of harmless error rule to erroneous admission of prior guilty plea).

[7] (Citations and punctuation omitted.) *Parrish v. State*, 237 Ga. App. 274, 283 (10) (514 SE2d 458) (1999).

[8] *Carl v. State*, 234 Ga. App. 61, 65 (2) (g) (506 SE2d 207) (1998).

[9] See *Benham v. State*, 277 Ga. 516, 518 (591 SE2d 824) (2004) (invoking the words "tactics" and "strategy" does not immunize trial counsel from a claim that such "tactics" or "strategy" are so unreasonable that no competent attorney would have employed them).

[10] See *Shoemake*, supra at 530.

included in OCGA § 17-7-93 (b) a prohibition against admitting evidence of a defendant's prior guilty plea.[11] Thus, the state could not have injected evidence of the plea if Dixon's counsel had not informed the jury of it first. And there does not appear to be any reason for Dixon's trial counsel to have raised the issue, inasmuch as she could have discovered which jurors had heard or read about the case without disclosing his guilty plea. We therefore find that the actions of Dixon's counsel in this regard fell below an objective standard of reasonableness.

Dixon must also show that there is a reasonable probability that, but for his counsel's discussion of his prior guilty plea, the results of the proceeding would have been different. Because the admissible evidence of Dixon's guilt was overwhelming, Dixon cannot make this showing.[12] We must therefore affirm the trial court's finding that Dixon did not receive ineffective assistance of counsel.[13]

(b) Dixon claims that his trial counsel was ineffective because she introduced evidence of his prior criminal history.

Dixon's mother testified before Dixon. During her testimony, Dixon's counsel brought out the fact that Dixon had been in trouble on three prior occasions and had been charged with possession of stolen property, sale of cocaine and burglary. At the motion for new trial hearing, Dixon's counsel testified that although the state had not mentioned Dixon's prior criminal history, she thought that his character had been brought into evidence and that the state would have been entitled to go into his criminal background.[14] For that reason, she decided to explain Dixon's prior criminal history before he testified to preempt anything the state might try to bring out during Dixon's cross-examination.

Having reviewed the entire transcript, we fail to see how Dixon's character had been put in issue such that the state would have been allowed to introduce evidence of his bad character.[15] Under these circumstances, we find that no reasonable attorney would have introduced evidence of unrelated prior criminal charges against Dixon. We therefore find that Dixon's counsel's performance was deficient.

But Dixon cannot meet the second prong of the ineffective assistance standard because of the overwhelming evidence of his

---

[11] Id.

[12] See *Ricarte v. State*, 249 Ga. App. 50, 56 (4) (d) (547 SE2d 703) (2001); see also *Shoemake*, supra.

[13] See *Ricarte*, supra.

[14] Counsel did not explain what evidence of Dixon's character had been admitted.

[15] See OCGA §§ 24-2-2; 24-9-20 (b).

guilt.[16] We must therefore affirm the trial court on this issue.[17]

(c) Dixon claims that his trial counsel was ineffective for failing to file a motion for change of venue based on pretrial publicity. In fact, the record shows that his trial counsel did file such a motion prior to trial but apparently never obtained a ruling on it. Dixon argues that his trial counsel should have sought a change of venue after voir dire, when several jurors revealed that they had heard about the case. He also points out that, during voir dire, after Dixon's counsel explained the history of Dixon's case (including his guilty plea), his trial counsel asked if the potential jurors who had previously read or heard anything about the case had formed an opinion of any kind. One potential juror responded, "Well, I'm going to say that admission of guilt still rings true to me. I don't know why that is, but —." Dixon's counsel did strike that juror, although not for cause.

At the motion for new trial hearing, trial counsel stated that she thought the motion for change of venue had been denied, but that if it had never been ruled upon, her failure to renew the motion was wrong. Assuming that trial counsel's failure to renew the motion for change of venue after voir dire fell below an objective standard of reasonableness, Dixon has failed to meet his burden of proving that counsel's deficient performance prejudiced his defense by creating a reasonable probability that the result of the proceedings would have been different but for counsel's error.[18] Based on the overwhelming evidence presented at trial, "there is no reasonable probability that [Dixon] would have been acquitted by any other jury."[19]

(d) Dixon claims that his trial counsel was ineffective for failing to object to leading questions by the state. Because this claim is not supported by any reference to the record or transcript, citation of authority or argument, we deem it abandoned.[20]

*Judgment affirmed. Smith, C. J., and Johnson, P. J., concur.*

DECIDED JUNE 30, 2004.

*Robert A. Maxwell,* for appellant.
*Fredric D. Bright, District Attorney, Dawn M. Baskin, Assistant District Attorney,* for appellee.

---

[16] See *Ricarte,* supra.
[17] See id.
[18] See *Walker v. State,* 223 Ga. App. 21, 24 (476 SE2d 801) (1996).
[19] Id.
[20] Court of Appeals Rule 27 (c) (2), (3).